BENJAMIN LOMBARD

v.

THE CHICAGO SINAI CONGREGATION.

1. SALE OF LAND—*vendor and vendee—difference in law and in equity.* There is a marked difference as to the rights and relations of the parties in the ordinary case of an executory contract for the sale of land, at law and in equity. At law, it confers upon the vendee a mere right of action, the estate remaining that of the vendor, and the unpaid purchase money that of the vendee. In equity, the estate, from the making of the contract, is regarded as the real property of the vendee, attended by most, if not all, of the incidents of ownership, and the purchase money as that of the vendor, upon the familiar principle that equity looks upon things agreed to be done as actually performed.

2. SAME—*who must bear loss by fire before conveyance.* Where a contract for the sale of land is absolute and complete, and the buildings thereon are accidentally destroyed by fire, pending the contract and before conveyance, the vendor having at the time of the sale a fee simple title, the loss, in equity, as upon a bill for specific performance, will fall upon the purchaser, he being regarded in such court as the real owner.

3. But where, in the case of an executory contract for the sale of real estate, the vendor was to furnish an abstract of title, and if not satisfactory he was to have the option of perfecting the title, or annulling the contract and returning the money paid, and the abstract failed to show title, and the vendor failed to exercise his option, after notice so to do, until after valuable and costly buildings thereon were destroyed by fire, the vendor still remaining in possession, it was *held,* on bill by the vendee for specific performance as to the land and compensation for the buildings and property destroyed, and exemption from the payment of interest during the time the vendor was in default, that the contract of sale lacked that completeness which would, in equity, make the land the property of the vendee, so as to make him bear the loss, it being subject to a contingency; and that, upon specific performance being ordered, the vendee was entitled to compensation for the loss, to be deducted from the purchase money; and that the vendor was entitled to interest on the unpaid purchase money only from the time a good title to the property was shown, the vendor being entitled to the rents and profits up to such time.

4. SAME—*waiver of laches.* Where, in such a case, the vendee, before the loss, called upon the vendor to obviate the objections to the title within a reasonable time—fixed at 20 days—or he would require a return of the

earnest money paid: *Held*, that this notice effectually precluded the ven
dee from taking advantage of the vendor's previous *laches*, by insisting
that thereby the agreement had become absolute, and that it put the ven-
dor upon his duty to make his election, and notify the vendee of the
result.

5. CONVEYANCE — *requisites to deed of incorporated religious society.*
Where a conveyance is made by an incorporated religious society, under
a decree of court, the individual names of the trustees should be inserted
in the body of the deed as grantors, with the addition of the words, "trus-
tees of," and giving the name of the society; and the granting clause
should witness that the parties of the first part, as trustees of, for and by
the direction of the society, for the consideration, etc., had bargained, etc.;
and the concluding part should show that "the parties of the first part, as
such trustees as aforesaid, have hereunto set their hands and seals," or
their official style should be added to their signatures, and the deed should
be acknowledged by the individuals, in their proper character as trustees.

6. ESTOPPEL — *by act of party.* Where a party had contracted with
others as an incorporated religious society, and afterwards brought suit
against them as a corporation, he was held to be estopped from denying
their corporate existence.

APPEAL from the Superior Court of Cook county; the
Hon. JOSEPH E. GARY, Judge, presiding.

This was a suit, by appellant, for the specific performance
of a written contract, entered into by the trustees of the
Chicago Sinai Congregation September 15, 1871, for the sale,
by said corporation to appellant, of certain parcels of land in
Chicago, upon which there was at the time a church edifice,
containing seats and a church organ, specifically embraced in
the contract, for an entire consideration of $62,500, to be
paid by appellant as follows: $2500 as earnest money at the
time of executing the contract; $7500 upon the delivery of
a warranty deed of the premises; the like sum 60 days from
October 1, 1871, with ten per cent interest; the balance in
three equal annual payments, bearing interest at the rate of
eight per cent, payable annually; all deferred payments to be
secured by notes and trust deeds (in the usual form) on the
premises, dated October 1, 1871.

The vendors were to furnish abstract of title, which was to
be examined within 14 days. It was provided that if there

should be any legal objections to the title, it should be optional with the vendors to return the earnest money, and declare the agreement canceled, or to make the title good.

Upon completion of the contract, appellant was to execute a lease to the vendors of the premises running from October 1, 1871, to May 1, 1872, at the rent of $200 per month.

The $2500 was paid by appellant, and abstract furnished at the execution of agreement. The abstract failed to show title in the vendors. The defects were pointed out, in a written opinion of counsel, and delivered to vendors September 28, 1871.

October 6, 1871, appellant notified vendors, in writing, that they must obviate the legal objections to their title, by obtaining the necessary deeds to perfect title, within a reasonable time, say 20 days, or he should require them to return the earnest money; that if they found they could not so perfect the title, to advise him of the same, without delay, and return the money, and he would cancel the contract. To this no reply was made; nor did the trustees, so far as this record shows, make the election before or within the 20 days from said notice.

The purchaser never having taken possession of the premises, at the great fire in Chicago, October 8 and 9, 1871, the building and contents, of the value of about $15,000, were destroyed. In November next after the fire, the purchaser caused the contract to be recorded in Cook county, where the premises were. Without any notice to the purchaser of their election, it seems that the vendors proceeded, after the fire, to perfect their title, but which they do not pretend was made good until about February 17, 1872. April 3, in same year, they prepared and tendered a deed, but to which the purchaser objected, as not sufficient in form or execution; and on the 5th of the same month, he filed this bill for specific performance as to so much of the property agreed to be sold as vendors could give him, for compensation for the portion destroyed, and to be exempted from paying the interest accruing, by the terms of contract, during the delay in

making the title good. The vendors, in their answer, admit the contract, the making and notifying of them of legal objections to title, and that they were valid; also admit receiving the notice October 6, and in their answer avow their right to declare the contract canceled, and so declare it, offering to return the earnest money. They filed a cross bill to have the contract declared canceled. Purchaser filed replication to their answer, and answer to cross bill. The case was heard upon pleadings and proofs, and decree dismissing cross bill. for specific performance as to land, but disallowing the claim for compensation and exemption from interest; charging purchaser's interest according to terms of contract; approving the deed tendered by vendors April 3, and requiring complainant to pay costs of suit. From this decree complainant appealed to this court.

Mr. SAMUEL W. FULLER and Mr. M. T. PETERS, for the appellant.

Messrs. ROSENTHAL & PENCE, for the appellee.

Mr. JUSTICE McALLISTER delivered the opinion of the Court:

This was a bill, by appellant, as purchaser, for the specific performance of a contract for the sale of certain parcels of land, a church edifice thereon and contents, including a church organ, for the entire consideration $62,500, of which $2500 were paid down. Between the agreement and the exercise by vendors of an option given them, in case legal objections should be made to their title, to declare the agreement canceled or to make their title good, a casualty occurred, by which building and contents, of the value of about $15,000, were destroyed by fire.

The bill sought specific performance as to land and compensation for building and contents destroyed; alleged delay of vendors in making title good, and sought exemption from interest during the delay. The court below decreed specific

performance, but, aside from certain insurance received by vendors, disallowed the claim for compensation; allowed purchaser the rents and profits, but required him to pay interest accruing during the delay.

The questions of compensation and exemption from interest are so blended that they may be considered together as substantially one question.

There seems to be no precedent in the cases which directly covers this case. The circumstances are peculiar, and differ materially from those of any of the cases cited by counsel for either party. It can be determined, therefore, only by the application of recognized principles of equity to the facts of the case.

Before entering upon a consideration of the peculiar features of this case, and the relations of the parties, we must advert to some of the relations regarded by equity as existing between vendor and vendee in the ordinary case of an executory contract for the sale of real estate. They are very familiar, but a brief recurrence to them is necessary to elucidate our views. The effect of such contract is very different at law and in equity. At law, it confers upon the vendee a mere right of action. The estate remains the estate of the vendor, and the money that of the vendee. In equity, it is otherwise. Here, the estate, from the making of the contract, is regarded as the real property of the vendee, attended by most, if not all, the incidents of ownership, and the purchase money as the property of the vendor. If we seek for the basis of this result—the principle underlying the doctrine—we find it in the principle of the familiar maxim, that " equity looks upon things agreed to be done as actually performed."

This maxim is but a legal fiction by which to work out certain ends or secure the attainment of a more complete justice. In most cases of contracts for the sale of real estate, the purchase money, in fact, remains in the hands of the purchaser, as the estate does with the vendor. Hence, as a corollary of the application of the maxim, equity recognizes and
31—64TH ILL.

attaches all the proper consequences to another relation, viz: that the vendee is to be considered as the trustee of the purchase money for the vendor, who is regarded as trustee of the land for the vendee.

These are some of the prominent features and relations arising out of the ordinary absolute contract of sale of real estate, and are regarded as fundamental in adjusting equities between vendor and vendee. The general proposition does not admit of controversy, upon the authorities, that from the making of an absolute contract of sale, the land is regarded, in equity, as the property of the vendee, who may dispose of it or incumber it in like manner with land to which he has the legal title, subject to the rights of the vendor under the contract. Fry on Specific Perf. sec. 889; *Sexton* v. *Slade,* 3 Lead. Cas. in Eq. (side p. 429); 1 Sug. on Vend. 175; *Smith* v. *Price,* 42 Ill. 399.

The true test in determining which party should bear the consequences of an accidental loss, pending a contract of sale, is, which was the owner at the time? In such a case, the Supreme Court of Massachusetts, in a recent case, laid down the general rule thus: "When property, real or personal, is destroyed by fire, the loss falls upon the party who is owner at the time." *Wells* v. *Culvan,* 107 Mass. 514.

No case has been cited, and we hazard nothing in saying that no respectable authority can be found, where it has been held that the purchaser should bear the consequences of an accidental destruction of a building by fire pending the contract, that the decision was not based principally upon the ground that in equity the premises were to be regarded as the property of the purchaser at the time. *That,* together with the fact that the contract was absolute and the vendor had a fee simple title at the time of the agreement, was the ground of the decision in *Brewer* v. *Herbert,* 30 Md. 301, cited and relied upon by counsel for appellees as in point here.

"Where the contract has been *completely made,* the thing sold was at the risk of the purchaser, who must bear all

subsequent losses and is entitled to all subsequent gains." Fry on Spec. Perf. sec. 600. Also cited by appellees.

When the contract has been completely made, the thing sold is at the risk of the purchaser; and why? The same author (sec. 889) furnishes the answer: "The result, in equity, of a contract of sale is that the thing sold thereupon becomes the property of the purchaser and the purchase money the property of the vendor."

Was there in the case before us a contract so completely made, at the time of the loss, as that, in equity, this building and contents had become the property of the purchaser? We say not. The contract lacked the completeness necessary to that result. From its first inception, it was subject to a contingency, the happening of which suspended the agreement and resolved it into a mere option on the part of the vendors to put an end to it or go on and make their title good. Can it, with reason, be said that while that option was pending and undetermined, the purchaser was nevertheless the real owner, in equity, of the property?

How, in such a case, could the principle underlying the entire doctrine of equitable ownership, viz: that "equity looks upon things agreed to be done as actually performed," be made to apply? When valid legal objections were made to their title, as was done, the agreement was suspended, and, by its own force, converted into a mere option to do one of two things; then, what things were agreed by the vendors to be done?

The primary thing impliedly agreed to be done, was that they would determine their option with reasonable promptitude. But does equity possess, or can we attribute to it, any faculty by which it could foresee how that election would be made?

Appellees admit that legal objections were made to their title September 28, 1871. They admit that they were valid objections, and not obviated before the destruction of the building, on October 8 and 9, same year; but their counsel

say that appellees decided at once, and prior to the fire, to complete the sale, and not annul the contract. They, however, refer us to no evidence in the record showing that fact. The decision on their part, without notice to the purchaser, would not suffice to make the contract absolute as to him. The vendors were a religious corporation under the general statute, and were authorized to act, in respect to the disposal of the church property, only in their corporate capacity as a congregation, and through a regularly constituted board of trustees.  R. S. sec. 46, pp. 120, 121.

We have examined the depositions in the record carefully, and find no evidence of any such determination having been made by any persons authorized to make it, or even of any meeting of the board of trustees subsequent to the date of the contract, and of but one meeting of the congregation at which this matter was considered, and that was in February, 1872, at which appellees' own witness says, it was resolved to close the trade, and the trustees were authorized to settle to the best of their judgment; but the witness says he thinks they were authorized to cancel the contract if they could not make a satisfactory settlement with appellant.

The notice given by appellant October 6, only two or three days before the fire, called upon the vendors to obviate the objections within a reasonable time—fixed at 20 days—or he would require a return of the earnest money paid; and also calling upon them, if they found that they could not comply, to advise him without delay.

This notice was upon the assumption that the option was still pending, and gave further time for its determination. This notice effectually precluded appellant from taking advantage of vendors' previous *laches*, by insisting that thereby the agreement had become absolute; and it also put them upon their duty to make their election, and advise him of the result; but they made no reply, and, so far as this record shows, paid no attention to a notice which fair dealing, under the circumstances, required them to heed and frankly respond to.

The circumstances also tend strongly to show that vendors designedly kept themselves in such a non-committal position, in respect to this matter of determining their option, that they could speculate upon the probable effect of the fire upon the price of land in the locality of theirs; experiment as to the cost and trouble of obtaining the requisite deeds to make their title good, and then subsequently cancel the contract, or proceed with its execution as interest might dictate. This inference is strengthened by the fact that, at the meeting of the congregation in February, 1872, the trustees were authorized to cancel it; that they asserted their right to do so in their answer to appellant's original bill, and filed a cross-bill for the express purpose.

This the law will not permit them to do. They were under an implied agreement to exercise the right of election with reasonable promptitude, and the not doing so was a breach of that agreement, made them guilty of *laches,* of which the purchaser, who is without fault, may take advantage by insisting that they thereby lost the right of election, and the contract became absolute to make their title good, and convey to him; and it appears that, waiting until the lapse of twenty days after the notice of October 6, the purchaser elected to affirm the contract, and, in November, 1871, caused it to be recorded in the proper county.

In addition to the circumstance of the option, and its pendency at the time of the fire, are the further facts: that the purchaser had not taken possession, and the vendors had not such title as that he ought or could, with safety, have taken possession, even if he had a right to under the contract, which he had not while the option was pending with his consent.

Appellees do not pretend that they had made their title complete until about February 17, 1872, and appellant rather concedes that it was then complete, with the exception that the abstract did not show their legal incorporation.

Under the peculiar circumstances of this case, and the wider application of equity, recognized by the courts in favor of purchasers, we are of opinion that the purchaser here, who is without fault, and has shown himself ready, willing and desirous of performing on his part, is entitled to maintain this bill to obtain so much of the property agreed to be sold as he can get, and to compensation to be deducted from the purchase money, for the portion of it destroyed pending the option of vendors. 3 Lead. Cas. in Eq. side p. 458–9; 2 Story Eq. Juris. sec. 779; 1 Sug. on Vend. 539; Adams' Eq. side p. 91.

The delay in completing the contract, though in some measure attributable to the state of the title, can not be divested of the character of a wilful, prejudicial default on the part of vendors, in respect to a positive duty to the purchaser, arising out of the very nature of their contract. In this view, and inasmuch as the interest is considerably more than the rents and profits, we think the case falls fully within the principles of the English chancery decisions, which hold that, in such case, the vendors should be left in possession of rents and profits until a good title was shown; and from that period only will they be entitled to interest, and the purchaser to the rents and profits. 3 Lead. Cas. in Eq. side p. 449–450, and cases cited; 2 Sug. on Vend. p. 797, sec. 15; ib. p. 807, sec. 46.

The remaining question relates to the sufficiency of the deed in form and execution. The contract called for a warranty deed, which, under the decisions of this court, it was the duty of vendors to prepare and execute. *Buckmaster* v. *Grundy,* 1 Scam. 310; *Headley* v. *Shaw,* 39 Ill. 366.

It is not the question here, whether this deed might be adjudged sufficient upon argument, but whether, upon its face, it was free from all probable doubt or question. Conveyances executed under the direction of courts of chancery should be correct in form and execution, and free from that looseness which so often subjects the titles of innocent purchasers to vexatious questions.

The manner of conveying the real estate of religious corporations is pointed out in the 46th sec. R. S. 120. The sufficiency of this deed required that the individual names of the trustees should be inserted as grantors, with the addition of the words: "Trustees of the Chicago Sinai Congregation."

That was done. The granting clause should witness that the said parties of the first part, as trustees of, for and by the direction of the Congregation aforesaid, for the consideration, etc., have bargained, etc.

In this respect the deed was not sufficiently certain.

The concluding clause should be, that the said parties of the first part, as such trustees as aforesaid, have hereunto set their hands and seals, or their official style should be added to their signatures, and it should be acknowledged by the individuals in their proper character as trustees; neither of which was done.

As to the point that the vendors did not show their incorporation, we are inclined to hold that, by contracting with, and suing them as a corporation, the appellant is estopped from denying their corporate existence. Ang. & Ames on Corp. 9th Ed. sec. 635.

The decree of the court below will be reversed, and the cause remanded for further proceedings not inconsistent with this opinion.

*Decree reversed.*